304 F.3d 223
In re PETRIE RETAIL, INC., Debtor.Luan Investment S.E., Appellant,v.Franklin 145 Corp., Cruz-Ponce Corp., Marianne, Ltd., formerly known as Urban Acquisition Corp., G&G Retail, Inc., Appellees.
Docket No. 01-5052.
United States Court of Appeals, Second Circuit.
Argued April 18, 2002.
Decided September 5, 2002.

Edilberto Berrios, New York City, (Thomas M. Gandolfo, Oppenheimer Wolff & Donnelly, LLP, of counsel), for appellant.
Mark S. Indelicato, New York City, (Donna J. Hyman, Hahn & Hessen, LLP, of counsel), for appellee, Franklin 145 Corp.
Mark N. Parry, New York City, (Moses & Singer, LLP, of counsel), for appellees, Marianne, Ltd., formerly known as Urban Acquisition Corp. and Cruz-Ponce Corp.
(McDermott, Will & Emery, New York City), for appellee, G & G Retail, Inc.
Before: OAKES, JACOBS and CALABRESI, Circuit Judges.
Judge JACOBS dissents in a separate opinion.
OAKES, Senior Circuit Judge.

1
Luan Investment, S.E. ("Luan") appeals from a July 19, 2001, Memorandum and Order and a December 4, 2001, Stipulation and Order entered by the United States District Court for the Southern District of New York, William H. Pauley III, Judge. The district court affirmed three orders entered by the United States Bankruptcy Court for the Southern District of New York, Arthur J. Gonzalez, Judge, in the context of the Chapter 11 proceedings of Petrie Retail, Inc. ("Petrie") and its subsidiaries. The bankruptcy court orders enjoined Luan from commencing or continuing any action contingent upon the interpretation of lease provisions that were at issue in the administration of the debtors' estate, denied Luan's request for an administrative claim against the estate, and struck from the record documents referencing extrinsic evidence the bankruptcy court found inadmissible. Because we find the bankruptcy court had subject matter and personal jurisdiction to issue the injunction, had discretion to refuse to abstain, and properly excluded parol evidence from the proceedings, we affirm.

BACKGROUND

2
This appeal involves an ongoing attempt by Luan to recover from a bankrupt and its assigns amounts believed to be owing under a lease for commercial property in Puerto Rico. On August 6, 1990, Luan Investment Corp. entered into a lease with Atlantico-M.P.A. ("Atlantico"), a former wholly-owned subsidiary of Petrie, for the operation of a Marianne/Marianne Plus store at the Aguadilla Mall in Aguadilla, Puerto Rico. Luan Investment Corp. subsequently assigned the lease to appellant Luan, to whom Atlantico attorned.

3
The lease provides for a fixed annual rent, to be paid in monthly installments. However, under Rider 2A to the lease, the obligation to pay the fixed rate of rent is contingent on the satisfaction of certain occupancy conditions at the Aguadilla Mall. Until the occupancy conditions are met, the tenant is obligated to pay a reduced rate of rate.

4
On November 10, 1993, Atlantico opened a Marianne/Marianne Plus store in the Aguadilla Mall. Because the occupancy conditions had not been met, Atlantico paid the reduced rate for rent.

5
On October 12, 1995, Petrie and its subsidiaries, including Atlantico (collectively, the "debtors"), filed a petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").1

6
Luan maintains, as it has throughout this case, that the occupancy conditions triggering the escalation in rent were satisfied on October 31, 1996. The debtors and their assigns argue that the occupancy conditions were not met in 1996 or at any time during these proceedings.

7
On or about April 28, 1998, Luan filed with the bankruptcy court a motion to compel Atlantico to pay post-petition rent amounts due under Luan's interpretation of the occupancy conditions of the lease and to compel the debtors to assume or reject the lease within thirty days (the "Luan motion"). Based on consensual requests of the parties, the bankruptcy court periodically adjourned the Luan motion until a hearing was held on December 16, 1999.

8
On November 12, 1998, in response to a bankruptcy court order setting a deadline for the filing of proofs of administrative expenses, Luan filed an administrative proof of claim for the additional rent. In addition, on November 20, 1998, Luan filed an objection to the debtors' motion seeking approval of the assumption and assignment of certain unexpired leases, asserting a cure objection and a cure claim objection to the debtors' plan of reorganization. Luan's proof of claim and objections to the debtors' reorganization plan sought the interpretation of the same lease provisions at issue in the Luan motion.

9
On December 1, 1998, the bankruptcy court held a hearing concerning the sale of the debtors' assets and related relief (the "sale hearing"). Luan was present at the sale hearing. On the same date, the bankruptcy court entered an order (the "sale order"), approving, inter alia, an Asset Purchase Agreement and the sale of the debtors' assets. Pursuant to the sale order, Marianne, Ltd. ("Marianne"), formerly known as Urban Acquisition Corp., acquired the lease at issue.2

10
Under the sale order, Marianne did not assume certain liabilities (the "excluded liabilities"). The excluded liabilities included defaults under the assigned contracts that existed prior to the assignment and any other obligations arising prior to, and required to be performed prior to, the assignment unless Marianne specifically assumed the obligations. The sale order provided that those holding excluded liabilities were "enjoined from asserting or prosecuting any Claim or cause of action" against Marianne related to the excluded liabilities. The sale order further barred and enjoined parties to the leases that were assigned from asserting against Marianne any default or breach under the leases that was outstanding as of the date of the closing. The sale order also contained provisions for payment of cure amounts and included a clause in which the bankruptcy court retained "sole and exclusive jurisdiction over all matters arising from or related to the [lease], the [debtors' motion seeking approval of the assumption and assignment of certain unexpired leases], the Transaction Documents, the implementation thereof and [the Sale] Order."

11
On December 8, 1998, the bankruptcy court entered an order (the "confirmation order") confirming the Debtors' Second Amended Joint Plan of Reorganization (the "plan of reorganization"). The plan of reorganization and confirmation order incorporated the terms of the sale order. The plan designated appellee Franklin 145 Corp. as the debtors' distribution company. The Plan's effective date and thus the closing date for the sale of assets was December 18, 1998.

12
On September 27, 1999, Luan sent a letter to Marianne declaring it in default and announcing its intention to terminate the lease for non-payment of rent. Invoking the rent-escalation provision in the lease, Luan demanded that Marianne pay additional rent of $411,030.05 plus $61,732.29 in interest, which amount the bankruptcy court found to include amounts defined as excluded liabilities under the sale order, the plan of reorganization, and the confirmation order.

13
On November 19, 1999, in response to Luan's letter, Marianne filed a motion with the bankruptcy court pursuant to 11 U.S.C. §§ 1141(a) and 1142(b) for an order in aid of consummation of the Plan (the "plan consummation motion"). The plan consummation motion sought entry of an order enforcing the sale order's injunction as to excluded liabilities and finding Luan in violation of the confirmation order for seeking to collect excluded liabilities.

14
On November 23, 1999, Luan filed a lawsuit against Marianne in Puerto Rico (the "Puerto Rico action") seeking entry of an order declaring Marianne in default under Luan's interpretation of the lease.

15
On December 16, 1999, the bankruptcy court held a hearing in connection with the plan consummation motion and the Luan motion. In opposition to the plan consummation motion, Luan argued that the bankruptcy court lacked subject matter jurisdiction over the dispute and personal jurisdiction over Luan, and that, regardless of the jurisdictional matters, the bankruptcy court should abstain from the action.

16
On December 21, 1999, the bankruptcy court entered an order granting the plan consummation motion and enjoining Luan from "commencing, continuing or prosecuting any action contingent upon the interpretation of the ... provisions of the leases at issue before this Court." The bankruptcy court determined that it had jurisdiction to enforce the pre-existing injunction as stated in the sale order and to interpret the lease in the context of Luan's administrative claim against the debtors and its claim against Marianne for excluded liabilities. In addition, the bankruptcy court found it had personal jurisdiction over Luan based on the fact that Luan put the interpretation of the lease before the court in its motion and submitted to the court's jurisdiction in that regard.

17
On March 8, 2000, the bankruptcy court held a hearing with respect to the interpretation of the lease. Marianne filed a motion in limine to exclude parol evidence on the ground that the terms of the lease were clear and unambiguous. On March 29, 2000, the bankruptcy court granted the motion in limine finding that, under Puerto Rico law, the terms of the lease related to the payment of rent were not ambiguous, and, therefore, parol evidence was not admissible to contravene the terms of the lease.

18
On June 7, 2000, the bankruptcy court entered an order resolving the Luan motion by denying Luan's request for an administrative claim, rejecting Luan's interpretation of the lease, and setting the amount of Luan's cure claim against the debtors' estates at $10,185.62. The order also denied as moot Luan's April 19, 2000, motion for summary judgment and denied Luan's request to have parol evidence admitted into the record.

19
On September 5, 2000, the bankruptcy court granted Franklin 145 Corp.'s motion to strike from the record on appeal parol evidence the bankruptcy court previously ruled inadmissible.

20
Luan timely appealed the December 21, 1999, June 7, 2000, and September 5, 2000, bankruptcy court orders to the District Court for the Southern District of New York. The district court consolidated the appeals and, on July 19, 2001, issued a memorandum decision affirming the bankruptcy court's orders with regard to jurisdiction, abstention, and application of the parol evidence rule. On December 4, 2001, the district court issued an order affirming the bankruptcy court's orders in their entirety, finding that its July 19, 2001, Memorandum and Order resolved all issues raised on appeal.

DISCUSSION

21
Luan argues that the district court erred by affirming the bankruptcy court's orders because: (1) the bankruptcy court did not have subject matter or personal jurisdiction to hear the plan consummation motion; (2) the bankruptcy court should have abstained from hearing the plan consummation motion where Luan had filed suit regarding the lease at issue in federal district court; and (3) the bankruptcy court erred by excluding parol evidence regarding the interpretation of the lease.3 We address each argument in turn but write primarily to address the first.

22
Our review of a district court decision affirming a bankruptcy court order is plenary. FCC v. NextWave Personal Communications, Inc. (In re NextWave Personal Communications, Inc.), 200 F.3d 43, 50 (2d Cir.1999). We therefore independently review the factual findings and legal conclusions of the bankruptcy court. Id. We must accept the bankruptcy court's findings of fact unless clearly erroneous; conclusions of law are reviewed de novo. Id.

I. Bankruptcy Court Jurisdiction

23
Luan argues that the bankruptcy court did not have subject matter jurisdiction over the contract dispute raised in the plan consummation motion and did not have personal jurisdiction over Luan as to that motion.

A. Subject Matter Jurisdiction

24
Luan argues that the bankruptcy court did not have subject matter jurisdiction over the plan consummation motion because it was part of a post-sale contract dispute between two non-debtors.

25
The jurisdiction of the bankruptcy court is set forth in 28 U.S.C. § 157. Bankruptcy proceedings are divided into two principal categories: "core" and "non-core." 28 U.S.C. § 157 (2001); United States Lines, Inc. v. Am. Steamship Owners Mut. Protection and Indem. Ass'n, Inc. (In re United States Lines, Inc.), 197 F.3d 631, 636 (2d Cir.1999). In core proceedings, the bankruptcy court has comprehensive power and may enter appropriate orders and judgments. 28 U.S.C. § 157(b)(1) (2001); see S.G. Phillips Constrs., Inc. v. City of Burlington (In re S.G. Phillips Constrs., Inc.), 45 F.3d 702, 704 (2d Cir.1995). In proceedings which are non-core, but which otherwise relate to a bankruptcy case under title 11, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court[.]" 28 U.S.C. § 157(c)(1) (2001).

26
The core/non-core distinction was first articulated in Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In Marathon, the Court considered the constitutionality of bankruptcy court jurisdiction under Article III of the Constitution, noting that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages[.]" Id. at 71, 102 S.Ct. 2858. The Court held that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law[.]" Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 584, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (discussing the Marathon holding). However, the Court "was unable to agree on the precise scope and nature of Article III's limitations." Id.

27
In response to Marathon, Congress codified the core/non-core distinction in the Bankruptcy Amendments and Federal Judgeship Act of 1984. In re S.G. Phillips Constrs., Inc., 45 F.3d at 705 (citing In re Arnold Print Works, Inc., 815 F.2d 165, 166-67 (1st Cir.1987) (Breyer, J.)). We have previously recognized that, in making the core/non-core distinction, "Congress realized that the bankruptcy court's jurisdictional reach was essential to the efficient administration of bankruptcy proceedings and intended that the `core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in Marathon." Id. Therefore, we construe Marathon narrowly and give core proceedings "a broad interpretation that is `close to or congruent with constitutional limits[.]'" In re United States Lines, Inc., 197 F.3d at 637 (quoting Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 68 F.3d 26, 31 (2d Cir.1995) (internal citation omitted)).

28
In this case, the plan consummation motion asked the bankruptcy court to enjoin Luan from proceeding with a contract action contingent upon the interpretation of the lease provisions at issue in the administration of Luan's claims in bankruptcy court. "[W]hether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." In re United States Lines, Inc., 197 F.3d at 637. The second prong of the inquiry "hinges on `the nature of the proceeding.'" Id. (quoting In re S.G. Phillips Constrs., Inc., 45 F.3d at 707). "Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, ... or (2) the proceedings directly affect a core bankruptcy function." Id. (internal citations omitted).

29
The plan consummation motion in this case involves a post-petition dispute that arose over a pre-petition lease. The fact that the lease was executed pre-petition and that the dispute between Luan and Marianne could arise outside of bankruptcy proceedings weighs against its core status. See In re United States Lines, Inc., 197 F.3d at 637-38. However, due to a combination of factors, the contract dispute in this case was not independent of the reorganization. Accordingly, the impact of the plan consummation motion on other core bankruptcy functions renders it core. See id.

30
First, the dispute in this case was based on rights established in the sale order. "[O]rders approving the sale of property" are core bankruptcy proceedings. 28 U.S.C. § 157(b)(2)(N) (2001). In this case, the sale order, plan of reorganization, and confirmation order set forth the rights Luan could assert vis-a-vis Marianne in connection with the sale of the lease, specifically prohibiting actions for excluded liabilities. Thus, although the original lease was a pre-petition contract, many of Marianne's rights with regard to the lease were established as part of the core bankruptcy court function of approving the sale of the Petrie property.

31
Moreover, the bankruptcy court found that Luan's demand of Marianne involved excluded liabilities as defined in the sale order. The bankruptcy court's finding was not clearly erroneous, and is therefore adopted by this court. Because Luan sought excluded liabilities, the contract dispute between Luan and Marianne involved rights specifically established by the sale order. Accordingly, the dispute was uniquely affected by and "inextricably linked to the bankruptcy court's Sale Order[.]" Comco Assocs. v. Faraldi Food Indus., Ltd., 170 B.R. 765, 772 (E.D.N.Y. 1994).

32
Second, the plan consummation motion sought enforcement of a pre-existing injunction issued as part of the bankruptcy court's sale order and confirmation order. A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization. See Back v. LTV Corp. (In re Chateaugay Corp.), 213 B.R. 633, 640 (S.D.N.Y.1997); In re Johns-Manville Corp., 97 B.R. 174, 179-80 (Bkrtcy. S.D.N.Y.1989). The plan consummation motion was filed in response to Luan's demand for excluded liabilities and sought enforcement of the injunction provisions outlined in the sale order, plan of reorganization, and confirmation order. Therefore, the dispute between Luan and Marianne involved interpretation of the bankruptcy court's orders. The bankruptcy court thus had jurisdiction over the plan consummation motion and, specifically, had jurisdiction to consider whether Luan was seeking excluded liabilities and, if so, to enforce the injunction provisions of its orders.

33
Third, the dispute between Luan and Marianne involved an issue already before the bankruptcy court as part of its consideration of Luan's claim against the estate. As such, the dispute uniquely affected and was uniquely affected by the core bankruptcy functions as to "matters concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A) (2001), and the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B) (2001). At the time the sale order was issued, Luan had filed an administrative proof of claim for additional rent from the estate, over which the bankruptcy court had core jurisdiction. See In re S.G. Phillips Constrs., Inc., 45 F.3d at 705; Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1390 (2d Cir.1990) ("[A] claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.") (citation omitted). The proof of claim, as well as the Luan motion and Luan's objections to the plan of reorganization, required the bankruptcy court to interpret the lease in order to determine what assets of the debtors' estate should be distributed to Luan. Thus, the interpretation of the lease was originally raised as part of the bankruptcy court's core function of determining whether to allow Luan's claim in the administration of the estate.

34
Luan's allegation against Marianne was identical to Luan's claim against the estate, namely, that the lessee was in default for failing to pay amounts due under the rent-escalation clause of the lease. In addition, Luan sought excluded liabilities from Marianne. The contract dispute between Luan and Marianne was thus a continued attempt by Luan to recover rent originally claimed from the estate. As such, it uniquely affected and was uniquely affected by the bankruptcy court's core functions of determining Luan's claim and administering the estate.

35
The combination of factors in this case leads us to conclude that the plan consummation motion was a core proceeding because it was not independent of the reorganization. Specifically, the plan consummation motion uniquely affected and was uniquely affected by core bankruptcy functions because the dispute between Luan and Marianne was based on rights established in the sale order, the plan consummation motion sought enforcement of a pre-existing injunction issued in the bankruptcy court's sale order, and the dispute involved an issue already before the bankruptcy court as part of its consideration of Luan's claim against the estate. We express no view as to whether any one of these facts alone would render a proceeding core. We further note, as the bankruptcy court did, that the bankruptcy court's core jurisdiction over the dispute between Luan and Marianne is limited to the enforcement of the rights established by the orders of the bankruptcy court and the resolution of issues raised in the reorganization.

B. Personal Jurisdiction

36
Luan argues that the bankruptcy court lacked personal jurisdiction over it in connection with the plan consummation motion.

37
Creditors subject themselves to the bankruptcy court's equity jurisdiction "by submitting a claim against the bankruptcy estate." Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 59 n. 14, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (citing Katchen v. Landy, 382 U.S. 323, 335, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)); see also First Fidelity Bank v. Hooker Invs., Inc. (In re Hooker Invs., Inc.), 937 F.2d 833, 838 (2d Cir. 1991). In this case, Luan filed a proof of claim for additional rent thereby subjecting itself to the bankruptcy court's "equitable power to [allow or] disallow [that] claim[]." Granfinanciera, 492 U.S. at 59, n. 14, 109 S.Ct. 2782.

38
Luan argues that it did not consent to determination of its claim in bankruptcy court because it was forced either to file a proof of claim or risk losing its claim against the debtors. We note that we have held that a creditor subjects itself to the bankruptcy court's jurisdiction even where filing a proof of claim is statutorily mandated. In re Best Prod. Co., 68 F.3d at 32. However, we need not decide whether filing the proof of claim was alone sufficient to invoke the bankruptcy court's jurisdiction in this case. In addition to filing a proof of claim, Luan appeared in the debtors' bankruptcy proceeding, filed a motion with the bankruptcy court seeking determination and payment of its administrative rent charge, and submitted objections to the debtors' motion seeking approval of the assumption and assignment of unexpired leases as well as the debtors' plan of reorganization. Moreover, Luan did not object to the personal jurisdiction of the bankruptcy court with regard to any proceedings related to its claim for additional rent. Therefore, Luan submitted to and invoked the bankruptcy court's jurisdiction over its claim.

39
Luan argues that, even if the bankruptcy court had personal jurisdiction over it as to the administrative claim and the Luan motion, the bankruptcy court did not have personal jurisdiction over Luan with regard to the plan consummation motion. As discussed above, the plan consummation motion sought enforcement of the sale order's existing injunction and sought relief based on the rights established in the sale order. The sale order specifically provided that the bankruptcy court would "retain sole and exclusive jurisdiction over all matters arising from or related to the [lease], the [debtors' motion seeking approval of the assumption and assignment of certain unexpired leases], the Transaction Documents, the implementation thereof[,] and this Order." Luan did not object or appeal from the sale order, confirmation order, or plan on the basis of personal jurisdiction. Accordingly, in addition to submitting to the bankruptcy court's jurisdiction with regard to its claims against the estate, Luan submitted to jurisdiction of the bankruptcy court with regard to the sale order and its enforcement. Because the plan consummation motion sought enforcement of the sale order, the bankruptcy court had personal jurisdiction over Luan with regard to the motion.

II. Abstention

40
Luan argues that the bankruptcy court erred by failing to abstain from hearing the plan consummation motion and the district court erred by affirming the bankruptcy court's decision.

41
Section 1334(c)(2) of Title 28 of the United States Code "requires the district court to abstain from hearing a non-core matter which can be timely adjudicated in state court in a previously commenced action." In re S.G. Phillips Constrs., Inc., 45 F.3d at 708. Abstention is only mandated with respect to non-core matters. Id. Therefore, where a matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable. As discussed above, the resolution of the plan consummation motion was a core proceeding. Therefore, mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) does not apply. Id.; Ben Cooper, Inc. v. Ins. Co. of the State of Penn. (In re Ben Cooper, Inc.), 924 F.2d 36, 38 (2d Cir.1991).

42
Permissive abstention from core proceedings under 28 U.S.C. § 1334(c)(1) is left to the bankruptcy court's discretion. In re S.G. Phillips Constrs., Inc., 45 F.3d at 708. Permissive abstention can be warranted "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1) (2001). In this case, the bankruptcy court did not abstain because the factors bearing on the interests of justice weighed heavily against abstention to avoid inconsistent interpretation of the lease and to prevent Luan from forum shopping. We find that the bankruptcy court's decision not to abstain under such circumstances fell within its discretion.

III. Parol Evidence

43
Luan argues that the bankruptcy court erred by excluding parol evidence when it interpreted the lease and that the district court erred in affirming that decision. We have considered Luan's arguments and, for the reasons stated in the thorough opinions of the bankruptcy and district courts, find them to be without merit.

CONCLUSION

44
For the foregoing reasons, we affirm the orders of the district court.

Notes:

1
On June 4, 1998, the bankruptcy court entered an order substantively consolidating the debtors' estates into a single Chapter 11 case

2
After acquiring the lease, Marianne designated its affiliate, Cruz-Ponce Corp. ("CPC"), as the tenant under the lease. For convenience, we will refer to these appellees collectively and individually as "Marianne."

3
In its brief, Luan raises additional arguments that were not raised before or addressed by the bankruptcy court. Because these issues are not properly before this court, we decline to address them

45
JACOBS, Circuit Judge, dissenting.

46
I respectfully dissent.

47
This dispute concerning the rent payable under a storelease was decided by the bankruptcy court against the landlord and in favor of two successive tenants:

48
• the Debtor, which held the premises until confirmation of the plan, and

49
• Marianne, Ltd. ("Marianne"), which acquired the lease, effective on the date of plan confirmation, pursuant to an asset sale approved by order of the bankruptcy court.

50
I dissent [i] because the bankruptcy court wrongly assumed jurisdiction over the landlord's claim against Marianne, a dispute that could not affect the bankrupt estate because Marianne did not acquire its interest prior to confirmation of the plan, and [ii] because the bankruptcy court's erroneous reading of the lease (affirmed by the majority without discussion) results in a commercial absurdity. One passage in the bankruptcy court's opinion erroneously premised jurisdiction in part on supposed needs to foster "bidder[] reli[ance] on the certainty of [the bankruptcy court] determining the terms and conditions of the Leases that were being sold" and to avoid a "chilling affect [sic] on sales conducted in bankruptcy cases." This passage creates an impression that buyers presume and rely upon a bias in bankruptcy court favoring debtors (and those who succeed to the debtors' interests) — an impression that is not dispelled by the merits decision, which unaccountably favors the party that acquired its interest pursuant to the plan. Worse, this passage commends the assumed bias because it promotes the sale of the assets marketed by bankrupt estates.

51
* The majority closely considers whether the bankruptcy court had jurisdiction over Marianne's rent obligation, which accrued post-confirmation. (Jurisdiction over the landlord's claim concerning the pre-confirmation rent owed by the Debtor is undoubted.) In the end, the majority predicates jurisdiction on a number of circumstances and properly declines to say whether less than all the circumstances found would suffice to support jurisdiction. But I cannot agree even with that cautious and limited holding.

52
In aid of its purported jurisdiction, the bankruptcy court enjoined proceedings in a lawsuit between Marianne and the landlord in Aguadilla, Puerto Rico, where the mall is located. Thus the bankruptcy court ousted the Puerto Rico Superior Court from deciding under Puerto Rico law the terms of a Puerto Rico lease with a Puerto Rico tenant, where the only connection to the bankrupt estate was that the tenant assumed the lease under the terms of the plan of confirmation. Among the facts cited in the majority opinion to justify this jurisdictional reach is the bankruptcy court's finding that the landlord's suit against Marianne in Puerto Rico seeks to recover disputed rents that allegedly accrued in part prior to confirmation. The first complaint is ambiguous in that respect, but in a hearing before the bankruptcy judge the landlord categorically disclaimed any intent to recover from Marianne any rent allegedly owed by the Debtor. The bankruptcy court's contempt power is amply sufficient to enforce such a representation to abide by the terms of the confirmation plan. The amended complaint, filed the day before the bankruptcy court enjoined the Puerto Rico litigation, seeks nothing but rent accrued post-confirmation.

53
Having found a sufficient basis for jurisdiction, the majority affirms the ruling on the merits summarily — which is not remarkable since there is little in this lease dispute that would ordinarily require a published opinion. But I consider the merits important because I cannot account for the result reached by the bankruptcy court otherwise than as a measure in aid of the bankruptcy court's explicit desire to foster "bidder[] reli[ance] on the certainty of [the bankruptcy court] determining the terms and conditions of the Leases that were being sold" and avoid a "chilling affect [sic] on sales conducted in bankruptcy cases."

2

54
The following few facts bear on the merits. The Debtor, which operated a retail chain, elected to assume the store lease in a mall owned by Luan Investment, S.E. in Aguadilla, Puerto Rico. Having assumed the lease, the Debtor assigned it for value to Marianne, pursuant to court order, effective on the date of the plan confirmation.

55
The 1990 lease contains the usual provisions concerning its term and the rent, but provides that if the tenant opens for business prior to occupancy by anchor stores, the tenant pay (in lieu of rent) a relatively nominal percentage of sales; and that after occupancy by anchor stores, the initial 12-year lease term would begin and a fixed rent (subject to escalation) would become payable. Although anchor tenant K-Mart moved in, a second anchor tenant (Amigo) arrived in 1996, the year following the tenant's bankruptcy. Since 1996, the landlord and the Debtor have been disputing whether the only acceptable second anchor under the lease was Sears, which has never moved in. The bankruptcy court ruled that Rider 2A of the lease is decisive on that issue:

56
Tenant shall not be required to open for business ... or pay any rent and the commencement date shall not be deemed to have occurred until such time as seventy-five (75%) percent of the small store[] gross leasable retail space, K-Mart and Sears, _______ have opened for business with the public at the Shopping Center (the "Opening Date"). If Tenant shall, at Tenant's sole option, elect to open for business with the public prior to such time, Tenant's sole obligation with respect to payment of any rent or additional rent hereunder shall be to pay four (4%) percent of Gross Sales, as hereinafter defined, for each month until the Opening Date shall have occurred (the applicable rent is hereinafter referred to as the "Pre-Opening Date Rental"). Such four (4%) percent shall be payable within 20 days following the end of each month prior to the Opening Date.

57
(Emphasis added.) Relying on Rider 2A, the Debtor and Marianne argued that as a matter of law because Sears never moved in, the commencement date of the lease term never arrived and the obligation to pay post-Opening Date rent never arose. This argument is defeated, in my view, by subsection 1(h) of the lease, under the rubric "Basic Provision and Definitions," which at least raises a question of fact as to whether the anchor that moved in is an adequate "replacement":

58
PRINCIPAL TENANT: K Mart and Sears (or replacement(s) thereof). (and their sublessees, successors or assigns).

59
(Emphasis added.) The bankruptcy court discounted this clause as a boilerplate definition not used elsewhere in the lease. However, paragraph 1 (of which the "Principal Tenant" definition above is a subsection) provides — in the first substantive sentence of the Lease — that it is itself "integral" and "incorporated into this Lease in all respects." Indeed, several basic and indispensable provisions are subparagraphs of section 1: thus subparagraph 1(a) supplies the date of the lease (August 6, 1990), and subparagraph 1(i) designates the mall space the tenant is to occupy.1

3

60
In the absence of Sears, a question arises as to whether the tenant that did occupy the anchor space is a "replacement" within the meaning of subparagraph 1(h). If so, Marianne owes rent as a tenant under the lease; if not, then by virtue of Rider 2A, the rent obligation did not arise (and never will), with consequences that a Puerto Rico court should decide, and probably will.

61
The lease terms are imperfectly drafted, and the parties could dispute (as they have) whether occupancy by a "replacement" tenant in the anchor space would trigger the post-Opening Date rental obligation, and if so, whether a particular anchor tenant is an adequate replacement within the parties' contemplation. Landlord's counsel proffered [i] deposition testimony by the executive who negotiated the lease on tenant's behalf that any department store would satisfy the anchor tenant requirement and [ii] testimony by its rental agent that the words permitting "replacement" anchor tenants were inserted because Sears had as yet made no commitment to occupy the anchor space. (Counsel for the tenants have not contested the landlord's characterization of the parol evidence.)

62
In granting a motion to exclude that parol evidence, the bankruptcy court ruled that the "terms of the lease related to the payment of the rent obligation are not ambiguous." Under Puerto Rico law, the intention of the parties governs the interpretation of the contractual terms at issue here. See 31 P.R.Laws Ann. § 3471 ("If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.") Extrinsic evidence may be used to determine the parties' intention "[w]here a mistake or imperfection of the agreement is put in issue by the pleadings." See 32 P.R.Laws Ann.App. IV, R. 69(B). Parol evidence was clearly required in this dispute under Puerto Rico law because the contract is laced with Riders, it is imperfectly drafted, it uses inconsistent terminology for the same things, and the reading held to be required by the supposedly unambiguous language creates a contract that lacks essential terms (such as beginning or end) and is commercially absurd.

63
The bankruptcy court's interpretation of the contract, that the tenant owes only "the Pre-Opening Date rent," is a commercial absurdity because (inter alia) under that reading of Rider 2A: [1] the "Opening Date" of the mall has not yet come; [2] the "commencement date" of the 1990 lease has not yet arrived; [3] the "Lease Term" — twelve years followed by a five-year renewal term — has not yet begun; and [4] the tenant's obligation to pay post-Opening Date rent has not yet accrued. And none of these things will ever happen. Since surrender of the premises is not required until the end of the Lease Term, it may be that the bankruptcy court contemplates a perpetual tenancy in which Marianne's only obligation is to pay four percent of gross sales if any, so long as it chooses to stay, or until the world comes to an end. Alternatively, the bankruptcy court may have envisioned (oddly) that the "Pre-Opening Date rent" would be paid for the post-Opening Date term of the lease. But the bankruptcy court has made no ruling as to the term of the rental obligation; the only provision construed is the one that determined the sole claim before the court, which was the landlord's claim for past rent due. In short, although the judgment decides the rent (i.e., the Rider 2A payment in lieu of rent), the judgment does not fix the term of occupancy. Moreover, the ruling that the payment obligation is found in Rider 2A necessarily means that there is no leasehold because the condition precedent (the occupancy by certain anchor stores) was not met. Rider 19A provides that:

64
Not withstanding anything to the contrary herein, should any of the K-Mart or Sears lease not be signed within twelve (12) months from the date of this lease, Tenant shall have the right to terminate the Lease by delivering notice to Landlord to such effect within sixty (60) days from the last day of the said twelve (12) month period.

65
(Emphasis added.) The Riders, read together, mean to me that if the anchor-store condition (however construed) was not met for a year, the tenant had 60 days either to walk away, or to waive the condition in Rider 2A and thereby assume its post-Opening Date obligations under the lease (including, not least, rent). The tenant did nothing, however, and the landlord could obviously do nothing by virtue of the automatic stay. This state of affairs obviously has consequences that go beyond the rent question decided by the bankruptcy court. However, those consequences could not until now be sorted out by the Puerto Rico Superior Court because the bankruptcy court enjoined the landlord from seeking relief in that forum.

66
The bankruptcy court's judgment means that payment of the pre-Opening Date rent is not a breach; by the same token, however, because the lease term begins only after the "Opening Date," the judgment means that there is no lease for a term of years. So I see nothing that prevents the landlord, armed with the bankruptcy court's judgment that the condition has not been met, and wielding that judgment as a sword, from seeking in Puerto Rico any relief at law or equity that Puerto Rico law may afford in such a circumstance, possibly including eviction and the imposition of fair market rent during hold-over.

4

67
In its jurisdictional analysis, the majority cites all but one of the reasons cited by the bankruptcy court. The majority omits (and thereby properly discounts) the idea that bankruptcy jurisdiction can rest (as the bankruptcy court ruled) on a supposed need to [1] foster "bidder[] reli[ance] on the certainty of [the bankruptcy court] determining the terms and conditions of the Leases that were being sold," and [2] avoid a "chilling affect [sic] on sales conducted in bankruptcy cases." Tellingly, the bankruptcy court also justified its assertion of jurisdiction over the landlord's dispute with the Debtor on the need to "maximize the assets [of] the estate". These reasons rely for their force entirely on an assumption that the bankruptcy court will be biased in favor of the Debtor and those who bid on assets of the estate. But for that bias, what palpable interest could Marianne have had in the construal of the disputed lease terms in the Southern District of New York rather than in the Commonwealth of Puerto Rico? The leasehold was formed in Puerto Rico; the mall is in Aguadilla; the obligations are being performed (or not) there; and the local law of the Commonwealth (concerning real property and contracts) solely controls. See generally Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 84, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (warning of "unwarranted encroachment" by bankruptcy courts over contractual rights arising under state law); see also In re United States Lines, Inc., 197 F.3d 631, 637 (2d Cir., 1999) ("Congress has minimal authority to control the manner in which `a right created by state law ...' may be adjudicated." (quoting Marathon, 458 U.S. at 84, 102 S.Ct. 2858)).

68
* * *

69
The majority did not mention or endorse the bankruptcy court's assertion of power to adjudicate disputes concerning the value of interests and things sold by a debtor pursuant to a bankruptcy court order. I dissent chiefly to emphasize that there can be no such power, and that the rationale asserted by the bankruptcy court for exercising such power — in essence, that the bankruptcy court can thereby promote the marketing of estate assets generally by maximizing the value of those assets in subsequent litigation — is invalid: the actual or supposed institutional bias of a forum is not a basis for its exercise of jurisdiction.

Notes:

1
The bankruptcy court cited a lease provision giving primacy to manuscript terms over printed terms, and therefore deemed the typewritten Rider 2A paramount. The key words in subparagraph 1(h) are of course also typewritten manuscript